UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| COLONY HILLS CAPITAL, LLC and GLENN HANSON,<br><br>          Plaintiffs,<br><br>     -against-<br><br>NORTHSTAR REALTY FINANCE CORP.,<br><br>          Defendant. | CIVIL ACTION NO. 15 cv 03656 LAK |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION**

**TO DISMISS THE FIRST AMENDED COMPLAINT**

**Table of Contents**

PRELIMINARY STATEMENT ............................................................................................... 1

ARGUMENT .................................................................................................................... 2

    I.    THE STANDARD ...................................................................................................... 2

    II.    THE COMPLAINT PROPERLY ALLEGES THE FORMATION OF A JOINT VENTURE. ........ 3

        a.    New York Law Recognizes Implied Joint Venture Agreements, Even When the Parties have Executed Non-Binding, Preliminary Agreements and Term Sheets....... 3

        b.    NorthStar Incorrectly Argues that, Based on the Term Sheet, No Joint Venture was Created ........................................................................................................ 6

    III.    THE COMPLAINT ALLEGES ALL OF THE INDICIA OF A JOINT VENTURE BETWEEN COLONY AND NORTHSTAR ........................................................................................ 8

        a.    Colony Shared Control Over the Venture......................................................... 9

        b.    The Joint Venture Required Contribution by NorthStar................................... 11

        c.    The Complaint Sufficiently Alleged that the Joint Venture Required Colony to Share in Losses ...................................................................................................... 12

        d.    The Complaint Sufficiently Alleges Evidence of the Parties' Intent to be Associated as Joint Venturers .................................................................................. 15

        e.    The Ultimate Inquiry:  NorthStar Induced Colony to Trust that NorthStar Would Act for the Parties' Joint Benefit ................................................................. 17

    IV.    THE COMPLAINT ALLEGES THAT NORTHSTAR'S BREACH OF ITS DUTY OF LOYALTY DIRECTLY CAUSED DAMAGES TO COLONY............................................................... 20

    V.    PLAINTIFFS PROPERLY STATED CLAIMS FOR TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS ADVANTAGE........................................................................ 22

        a.    Plaintiffs Have Properly Pled that NorthStar Engaged in Wrongful Conduct . 22

        b.    NorthStar Caused a Termination of Colony's Business Relationship with Delaney, Albeit a Different Relationship was Subsequently Created. ...................... 26

    VI.    COLONY HAS STATED A CLAIM FOR UNJUST ENRICHMENT ..................................... 30

CONCLUSION .................................................................................................................. 32

**Table of Authority**

Cases

*Aetna Cas. And Sur. v. Aniero Concrete*, 404 F. 3d 566, 587 (2d Cir. 2005)................................. 31

*Anschutz Corp. v. Merrill Lynch & Co.,* 690 F.3d 98, 107 [2d Cir. 2012] ......................................... 3

*Argilus, LLC v. PNC Financial Services Group, Inc.,* 419 Fed.Appx. 115, 119 (2d Cir.2011) ............. 4

*Artco, Inc. v. Kidde, Inc.,* 1993 WL 962596, at *10 (S.D.N.Y. Dec. 28, 1993) ............................... 14

*Ashcroft v. Iqbal,* 556 U.S. 662, 663 (2009)................................................................. 2

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)........................................................ 2

*Brown v. Cara*, 420 F. 3d 148 (2d Circ. 2005)................................................................. 8

*Carvel Corp. v Noonan,* 3 NY3d 182, 190-191 [2004] ................................................... 26

*Chambers,* 282 F.3d at 153; *Hayden v. County of Nassau,* 180 F.3d 42, 54 (2d Cir.1999) ............. 3

*FMC Corp. v. Taiwan Tainan Giant Industrial Co.,* 730 F.2d 61, 63 (2d Cir.1984) ....................... 24

*Frank v. Coldwell Banker Schlott*, No. 94 Civ. 8181, 1995 WL 479441, at *2 (S.D.N.Y. Aug. 14, 1995) ..................................................................................................... 7

*Guard-Life v. Parker Mfg*, 50 NY 2d 183 (1980)................................................... 23, 24

*Herrick Co. v. Vetta Sports, Inc.*, No. 94 Civ. 0905, 1996 WL 434571, at *4 (S.D.N.Y. Aug. 2, 2006) ........................................................................................................ 27

*Integrated Cash Mgmt. Serv. v. Digital Transactions*, 920 F. 2d 171 (2d Cir. 1990).............. 25, 26

*Jim Ball Chrysler LLC v Marong Chrysler-Plymouth, Inc.,* 19 AD3d 1094, 1095 [2005]................. 26

*Johnson v. Nextel Commc'ns, Inc.,* 660 F.3d 131, 138 (2d Cir. 2011)............................................ 20

*Khan v. Salomon Bros. Inc.*, 813 F. Supp. 191, 195 (E.D.N.Y. 1993) .............................................. 27

*Learning Annex Holdings v. Whitney Educ. Group*, 765 F. Supp. 2d 403 (S.D.N.Y. 2011)............. 18

*Madonna v. United States*, 878 F.2d 62, 65 (2d Cir. 1989) ................................................. 3

*Mangini v. McClurg*, 24 NY 2d 556, 562 (1969) ........................................................... 31

*Meisel v. Grunberg,* 651 F.Supp.2d 98, 115 (S.D.N.Y.2009) ............................................ 3

*Richbell Information Services, Inc. v. Jupiter Partners, LP,* 309 A.D.2d 288, 765 N.Y.S.2d 575 (1st

Dep't 2003) ..................................................................................5, 6, 7, 8, 17

*Sea Shipping Inc. v. Half Moon Shipping, LLC,* 848 F.Supp.2d 448, 458 (S.D.N.Y. 2012) ........ 4, 6, 8

*Sheppard v. Beerman*, 18 F.3d 147, 150 (2d Cir. 1994) .................................................. 3

*Snyder v Sony Music Entertainment,* 252 AD2d 294, 299-300 [1999] .................................... 26, 27

*Solutia Inc. v. FMC Corp,* 456 F. Supp. 2d 429 (S.D.N.Y. 2006) .................................... 7, 8

*South Fourth St. Props. v Muschel,* 1 AD3d 347, 348 [2003] ...................................... 27

*Stem v. Warren,* 185 A.D. 823, 174 N.Y.S. 30 (1919) ................................................. 4

*Street-Works Dev. LLC v. Richman*, No. 13 CV 774, 2015 WL 872457, at *4-5 (S.D.N.Y. Feb. 3,

2015) ........................................................................................................ 13

*US Airways Grp., Inc. v. British Airways Plc*, 989 F. Supp. 482 (S.D.N.Y. 1997) ............................ 13

Statutes

Federal Rule of Civil Procedure 12(b)(6) ...................................................................... 2

Treatises

*Restatement of Torts* § 757 .................................................................................... 24

The plaintiffs Colony Hills Capital, LLC ("Colony") and Glenn Hanson respectfully submit this memorandum of law in opposition to the motion of defendant NorthStar Realty Finance Corp. ("NorthStar") to dismiss the First Amended Complaint (the "Complaint" or "Compl."), pursuant to Federal Rule of Civil Procedure 12(b)(6) on the grounds that the Complaint fails to state a claim upon which relief can be granted.

## PRELIMINARY STATEMENT

In this action, plaintiffs allege that Colony and NorthStar were joint venturers in an effort to acquire a portfolio of five garden style apartment complexes comprising 2,013 residential units, located in Mobile, Alabama (referred to as the "Delaney Portfolio").

Principally, the Complaint alleges that NorthStar breached its duties of loyalty and good faith to Colony by, among other things, secretly negotiating directly with the seller of the Delaney Portfolio on its own behalf to culminate an acquisition independent of the joint venture and at Colony's expense.  Ultimately, Colony acquired the Delaney Portfolio, but Plaintiffs claim that Colony's costs were greater they lost substantial profit their due to an offer made by NorthStar on its own behalf at a time when Colony and NorthStar were joint venturers.

The Complaint seeks recovery under theories of breach of fiduciary duty and wrongful interference in prospective business advantage.  The Complaint also asserts a claim of unjust enrichment arising from NorthStar's receipt of $75,000 in fees from Colony.

Defendant's motion to dismiss is based upon Defendant's assertion that no fiduciary duties arose between the parties because no joint venture was formed.

1

Defendant's contention that the Complaint fails to allege the existence of a joint venture is premised on two fundamentally incorrect assumptions not supported by the Complaint.

First, Defendant incorrectly argues that the Term Sheet alone constitutes the sole evidence of the parties' agreement.  Whereas, the Complaint sets forth the substantial indicia of a joint venture based upon the *implied* agreement evidenced by the parties' conduct in conjunction with the Term Sheet.

Second, Defendant incorrectly assumes that the scope of the joint venture alleged in the Complaint extended beyond the acquisition of the Delaney Portfolio to include the property's ownership and operation.  Whereas, the Complaint and the evidence incorporated by reference, to wit the Term Sheet, expressly provide that the parties joined as co-venturers for the particular purpose of bringing about an acquisition of the Delaney Portfolio – and not for the subsequent operation and ownership of the assets.

But for these erroneous assumptions, Defendant would have no basis to challenge the Complaint herein.

**ARGUMENT**

I.   **THE STANDARD**

To survive a Rule 12(b)(6) motion, a plaintiff must plead sufficient factual allegations "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 663 (2009). The Court accepts as true all well-pleaded factual

2

allegations (s*ee Anschutz Corp. v. Merrill Lynch & Co.,* 690 F.3d 98, 107 [2d Cir. 2012]), and the

Court views the pleadings in the light most favorable to, and draws all reasonable inferences in

the plaintiff's favor.  See *Sheppard v. Beerman*, 18 F.3d 147, 150 (2d Cir. 1994); *Madonna v.*

*United States*, 878 F.2d 62, 65 (2d Cir. 1989).

In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a

district court may consider the facts alleged in the complaint, documents attached to the

complaint as exhibits, and documents incorporated by reference in the

complaint. *Chambers,* 282 F.3d at 153; *Hayden v. County of Nassau,* 180 F.3d 42, 54 (2d

Cir.1999).  Here, Plaintiff has submitted with this memorandum of law the Declaration of

Moshe Mortner which attaches a release proposed by NorthStar, which is referenced in the

Complaint.

## II.   THE COMPLAINT PROPERLY ALLEGES THE FORMATION OF A JOINT VENTURE.

### a.   New York Law Recognizes Implied Joint Venture Agreements, Even When the Parties have Executed Non-Binding, Preliminary Agreements and Term Sheets.

Count One of the Complaint alleges that NorthStar breached its fiduciary duty to Colony.

Under New York law, a predicate for breach of fiduciary duty is that a fiduciary

relationship existed between the parties. *Meisel v. Grunberg,* 651 F.Supp.2d 98, 115

(S.D.N.Y.2009).  Plaintiffs contend that the complaint and the Term Sheet set forth sufficient

facts to allege a fiduciary relationship because Colony and NorthStar were joint venturers.

"Under New York law, participants in a joint venture owe one another the same fiduciary duties

that inhere between members of a partnership." *Argilus, LLC v. PNC Financial Services Group,*

3

*Inc.,* 419 Fed.Appx. 115, 119 (2d Cir.2011) (citing *Stem v. Warren,* 185 A.D. 823, 174 N.Y.S. 30 (1919)).

However, Defendant NorthStar argues that the Complaint fails to allege adequately that a fiduciary relationship existed between Colony and NorthStar (Defendant's Memorandum of Law in Support of Rule 12(b)(6) Motion to Dismiss ["Def. Memo."] at pp. 11-12), and Defendant argues that, in fact, no such relationship existed (Def. Memo. at pp. 12-13). Defendant's argument that Colony failed to state a claim for breach of fiduciary duty is based solely on an analysis of the Term Sheet, irrespective of any allegations contained in the Complaint as to an implied agreement. Thus the headings for Defendant's arguments are,

- "The Term Sheet Did Not Create a Joint Venture,"

- "The Term Sheet Was Non-Binding and Conditional," and

- "The Term Sheet Does Not Meet the Specific Requirements Under New York Law for Creation of a Joint Venture."

However, nowhere does the Complaint allege that the parties were members of a joint venture by virtue of an *express written agreement,* such as the Term Sheet. Rather the Complaint, in alleging the existence of a joint venture agreement, incorporates those portions of the Term Sheet that represented agreement between the parties along with the conduct of the parties as set forth in a highly detailed pleading.

The Complaint is consistent with the law in New York, which holds that an express joint venture agreement is not required, and a joint venture may exist "'based upon the *implied* agreement evidenced by the parties conduct.'" *Sea Shipping Inc. v. Half Moon Shipping, LLC,* 848 F.Supp.2d 448, 458 (S.D.N.Y. 2012)(quoting *Richbell Information Services, Inc.*

*v. Jupiter Partners, LP,* 309 A.D.2d 288, 297, 765 N.Y.S.2d 575, 583 (1st Dep't 2003)).

 The parties in *Richbell Information Services, Inc. v. Jupiter Partners, LP* contracted to form a corporate vehicle to carry out the acquisition of a third-party company.  However, the First Department found that before the parties ever entered into a formal stockholders agreement to govern the acquiring vehicle, the parties had entered into a joint venture to acquire the third-party company which created fiduciary duties among the parties.  Moreover, **the First Department found that the joint venture was formed notwithstanding the existence of letters and term sheets which claimed to be nonbinding**.  The Court found that the defendant sent a new letter and preliminary term sheet that expressly conditioned the defendant's assent upon a formal agreement:

> "[O]ur willingness to complete the transactions contemplated by this letter is subject to the execution of definitive agreements between us * * * . Except for [certain paragraphs] this letter is not and is not intended to be a legally binding agreement. Neither of us shall be liable to the other except as provided in such definitive agreements." Id. at 292.

 Notwithstanding the foregoing letter, the First Department held that the complaint in *Richbell* properly alleged the existence of a joint venture.  The Court held,

> The motion court correctly determined that the parties were not members of a joint venture by virtue of *express written agreements.* The July 8 letter referred to Jupiter's as yet uncompleted due diligence, and used language reflecting that an agreement might be reached at some time in the future, but had not been reached so far and, moreover, referred to the attached term sheet as a "draft"; the term sheet itself was labeled "preliminary." This is a classic example of an unenforceable "mere agreement to agree." Indeed, we recognize that term sheets, such as those used here, will not support a claim of breach of contract or of the duty of good faith (*Kreiss v McCown DeLeeuw & Co.,* 37 F Supp 2d 294, 301 [1999]; *Health & Community Living, Inc. v Goldis Fin. Group, Inc.,* 1998 WL 117928, *5, 1998 US Dist LEXIS 3069,

*12-14 [ED NY, Mar. 13, 1998]). Further, the July 22 letter accompanying a new term sheet clearly conditioned the transaction upon the execution of definitive agreements.

Nevertheless, the court erred in dismissing the first and second causes of action, premised on the breach of a fiduciary duty created by the joint venture. While the documents do not establish an express agreement to form a joint venture, nor do they "utterly refute[] plaintiff's factual allegations, conclusively establishing a defense as a matter of law" (*see Goshen v Mutual Life Ins. Co.,* 98 NY2d at 326). The intention to commit an agreement to writing will not prevent contract formation prior to execution (*T. Moriarty & Son v Case Contr.,* 287 AD2d 390 [2001], *lv withdrawn* 98 NY2d 670 [2002]; *Elizabeth St. v 217 Elizabeth St. Corp.,* 276 AD2d 295 [2000]).

Thus, "under New York law, even where there is no express joint venture agreement, a joint venture may exist 'based upon the *implied* agreement evidenced by the parties' conduct.'" *Sea Shipping Inc. v. Half Moon Shipping, LLC*, 848 F. Supp. 2d 448 (SDNY 2012), quoting *Richbell, supra* at 583.

### b.  NorthStar Incorrectly Argues that, Based on the Term Sheet, No Joint Venture was Created

NorthStar argues that no joint venture was formed because, "the Term Sheet, on its face, clearly did not create a joint venture."  NorthStar contends,

Importantly, the Term Sheet expressly stated that it would not be "deemed to create any rights in favor of, or impose any obligations upon," either party to the Term Sheet.  Ex. 3 at 3.

Moreover, the transaction contemplated by the Term Sheet was subject to a host of contingencies,… Where, as here, an agreement calls "for future approvals and expressly anticipates future preparation and execution of contract documents," it "clearly indicates an intent not to be bound" and does not create a binding contract, let alone a joint venture.  Thus, "[g]iven the parties' contractual intent not to be bound, … [Defendant] did not

6

> owe any duties to [Plaintiff] as a co-venturer.  *Frank v. Coldwell Banker Schlott*, No. 94 Civ. 8181, 1995 WL 479441, at *2 (S.D.N.Y. Aug. 14, 1995) (granting motion to dismiss claim based on a preliminary, non-binding agreement); *see also Solutia Inc. v. FMC Corp.*, 456 F. Supp. 2d 429, 443 (S.D.N.Y. 2006) (See Def. Memo, pp. 12-13)

NorthStar's reliance in the above quoted section on *Frank v. Coldwell Banker Schlott* is without merit since the District Court in that case made its decision in 1995, prior to the First Department's groundbreaking decision in 2003 in *Richbell*, which is discussed above.

However, NorthStar places its greatest reliance on *Solutia Inc. v. FMC Corp,* 456 F. Supp. 2d 429 (S.D.N.Y. 2006).  In fact, *Solutia* is inapposite since Judge Pauley in *Solutia* specifically distinguished the facts in that case from the facts in *Richbell*.  In *Solutia* the District Court noted that the joint venture agreement was not binding on the parties, because, "by its express terms the JVA did not create a joint venture under New York law until the Effective Date," and "each party's contribution of assets to the Joint Venture was to be effective only on the Effective Date, and the assets were not to be commingled until that date."  *Id*. at 445.

Based on the foregoing, the Court in *Solutia* distinguished its holding from *Richbell* on two grounds:

> 1. The District Court in *Solutia* noted that case "involved a written agreement manifesting the parties' intention *not* to be bound except upon the occurrence of certain conditions precedent," whereas the Term Sheets and letters in *Richbell* did not contain an express condition precedent that would trigger a binding agreement; *Id*. at 446, and
>
> 2. The District Court in *Solutia* noted that "*Richbell* involved the pleading standard for a joint venture on a motion to dismiss, and is therefore

inapplicable to the instant motion," which in *Solutia* was a motion for summary judgement.  *Id*.

Based on the foregoing, NorthStar's reliance on *Solutia* is misplaced, because here, the Term Sheet was similar in its language to the one in *Richbell,* and did not contain a condition precedent and terms such as in the JVA in *Solutia.*  Therefore, NorthStar's contention that the nature of the relationship between NorthStar and Colony can be discerned only from the Term Sheet is without merit.  Rather the Court must look at the broader indicia of the parties' relationship, as in *Richbell.  Solutia* represents only a narrow and inapposite exception to the expansive inquiry that *Richbell* requires of a court in considering whether the parties in an action have formed a joint venture.


   III.   **THE COMPLAINT ALLEGES ALL OF THE INDICIA OF A JOINT VENTURE BETWEEN COLONY AND NORTHSTAR**

In *Brown v. Cara*, 420 F. 3d 148 (2d Circ. 2005) the Second Circuit adopted the requirements from *Richbell* for determining the existence of a joint venture based on implied contract.  "The indicia of the existence of a joint venture are: acts manifesting the intent of the parties to be associated as joint venturers, mutual contribution to the joint undertaking through a combination of property, financial resources, effort, skill or knowledge, a measure of joint proprietorship and control over the enterprise, and a provision for the sharing of profits and losses." Id. at 159-160, quoting *Richbell Information Servs., Inc. v. Jupiter Partners, L.P.,* 309 A.D.2d 288, 298, 765 N.Y.S.2d 575 (2003).  See also *Sea Shipping Inc. v. Half Moon Shipping*, *LLC,* 848 F. Supp. 2d 448 (S.D.N.Y. 2012) ("*Richbell* sets out the standard for a joint venture based on implied agreement.")

### a.  Colony Shared Control Over the Venture

NorthStar contends "there expressly was no *shared* control over the alleged joint venture."  Specifically, NorthStar notes that subsequent to the closing of the acquisition of the Delaney Portfolio, only NorthStar could exercise control over the acquired property.  Thus, NorthStar argues, "Moreover, the Complaint makes clear that pursuant to the Term Sheet, 'NorthStar—not Colony—*would have sole discretion in the management, sale and refinancing of the acquired property.*' Compl. ¶¶ 32(d)"

However, the Complaint does not allege that the scope of the joint venture between Colony and NorthStar extended to the management, operation or disposition of the Delaney Property subsequent to the acquisition.  Therefore, the issue of control over the property after the acquisition is irrelevant to the joint venture.

The joint venture alleged in the Complaint was not in the nature of two parties acquiring a business prospect for the purpose of jointly owning and operating it.  Rather, the Complaint alleges that the purpose and scope of the joint venture was to bring about a closing on the Agreement of Purchase and Sale that Colony had executed with Delaney for the acquisition of the Delaney Portfolio.  The Complaint explains that the contract was a valuable and unique asset, to wit,

> 13.  The sale of the Delaney Portfolio was an off-market transaction from a prominent family in Mobile, Alabama who had developed, owned and managed the assets over their life.
>
> 14.  The Agreement of Purchase and Sale to acquire the Delaney Portfolio was a valuable opportunity for Colony.  The Delaney Portfolio presented a unique opportunity to Colony to acquire a well-positioned and maintained portfolio which had historically

underperformed economically due to family ownership and
expense mismanagement.

Furthermore, the Complaint expressly describes the scope of the joint venture as being

limited to achieving an acquisition based on Colony's contract:

> 30.  Two days later, on December 21, 2012, NorthStar submitted a
> new proposal to Colony whereby NorthStar and Colony would
> close the Delaney Portfolio acquisition as joint venture partners.
>
> ***
>
> 59.  As a coventurer with Colony and, in particular, as managing
> coventurer, NorthStar owed Colony the duties of a fiduciary,
> including a duty of undivided and undiluted loyalty in matters
> relating to the venture until the moment the Agreement of
> Purchase and Sale closed or was terminated by Delaney, which
> occurred on January 2, 2013.

In addition, the Term Sheet also described the joint venture as being for the limited

purpose of acquiring the Delaney Portfolio, wherein it states,

> Colony (on its own behalf and on behalf of its affiliates) agrees to
> negotiate and work in good faith with NorthStar in order to
> facilitate closing.
>
> ***
>
> After closing, Colony and NorthStar shall prepare and release a
> press release describing **the closing of the transaction as a 'joint
> venture' of Colony and NorthStar** in form and substance approved
> by NorthStar.  (See Defendant's Exhibit 3, at 3 (emphasis added).)

Thus, the Term Sheet describes the scope and purpose of the joint venture as Colony

and NorthStar working together to achieve a closing of the transaction, and most important,

the Term Sheet does not extend the parties' comingling of effort or the joint venture to the

management, operation or disposition of the acquired property subsequent to the jointly

achieved closing of Colony's Agreement of Purchase and Sale.  Therefore, Defendant's

10

argument that Colony lacked any aspect of control because NorthStar alone would take on the

management and disposition of the property subsequent to the acquisition is without merit.

Defendant's argument is based on the conduct of NorthStar outside of the scope of the joint

venture, at a time after the joint venture would have been concluded.

In fact, as regards "the closing of the transaction as a 'joint venture' of Colony and

NorthStar," both parties exercised control over the deal.  The Agreement of Purchase and Sale

was in Colony's name, so ultimately only Colony could negotiate and approve changes in the

terms of the agreement and only Colony could allow NorthStar to participate directly in

negotiations with the seller -- Delaney.  Accordingly, the Complaint describes Colony's exercise

of its control over the transaction and negotiations during the time that the joint venture was

operating, stating,

> 34.  On December 22, 2012, Colony conducted negotiations with Delaney resulting in a reduction in the purchase price by $2,000,000 to $96,000,000.

> 35.  On December 23, 2012, Colony introduced NorthStar to representative of Delaney and admitted NorthStar into a three-way conference call with Delaney.

> &#42;&#42;&#42;

> 57. In addition, the ongoing conduct between the parties further demonstrated that NorthStar was a coventurer and fiduciary of Colony, because Colony permitted NorthStar to participate in direct negotiations with the seller, Delaney.

Thus, the Complaint alleges that Colony shared control over the joint venture.

### b.  The Joint Venture Required Contribution by NorthStar

Defendant argues, "The Term Sheet did not require NorthStar to make any

contribution."  In fact, both parties were required to contribute to the success of the joint

venture.  Colony contributed its Agreement of Purchase and Sale  with Delaney, which it had

acquired at the cost of a deposit of $500,000 and the posting of $1.25 million in Earnest Notes,

and Colony also contributed its due diligence for the transaction, which based on the Term

Sheet cost Colony $268,379.  For its part, NorthStar was to contribute the purchase money

necessary to the closing of the transaction.  Defendant argues that because the Term Sheet

makes no specific mention of NorthStar supplying the purchase money, no contribution was

required of NorthStar to effect the purpose of the joint venture.  In fact, the Term Sheet does

refer to NorthStar's "capital contributed in connection with the purchase of the Property" in

the paragraph describing the parties' profit participation agreement.  Moreover, as noted

above, the Term Sheet alone does not constitute the complete implied agreement between the

parties, and the Complaint alleges that an essential term of the joint venture was that

"NorthStar would supply the funds for the purchase of the Delaney Portfolio and, therefore,

had a risk of loss."  (Compl. ¶ 56(c)) Thus, the Complaint does allege that the success of the

joint venture required contribution by NorthStar.


### c.  The Complaint Sufficiently Alleged that the Joint Venture Required Colony to Share in Losses

Defendant argues that the joint venture did not require Colony to share in any losses.

Defendant states,

> [B]oth the Complaint and the Term Sheet are devoid of any
> statement obligating Colony to share in the losses of the alleged
> joint venture business.  Colony attempts to bridge this gap by
> stating that it "retained its risk of loss for the $1,750,000 in
> Earnest Money and Earnest Money Note that Colony had provided

> Delaney under the Agreement and Purchase of Sale." Compl. ¶ 58. But Colony's payment of Earnest Money and the Earnest Money Deposit ($500,000) to Delaney has nothing to do with the contingent agreement between Colony and NorthStar because Colony was obligated to pay that sum to Delaney *before* Colony and NorthStar ever interacted.

Defendant is wrong. The fact that Colony could lose its Earnest Money Note and Earnest Money Deposit if the joint venture failed in achieving its stated purpose, the closing of Colony's Agreement of Purchase and Sale for the acquisition of the Delaney Portfolio, represented a true sharing in loss by Colony.

Defendant's argument is incorrect because it mischaracterizes the scope and purpose of the joint venture. Defendant argues, "[T]he Earnest Money and the Earnest Money Note were not losses related to the purported 'business' contemplated in the Term Sheet—the acquisition, ownership, and management of the Delaney Portfolio."

However, the purpose of the joint venture, as noted above, was not ownership, and management of the Delaney Portfolio. The joint venture stopped at "the closing of the transaction." The potential loss of the Earnest Money Note and the buyer's Deposit were losses that related directly to the purpose of the venture.

Nevertheless, Defendant tries to argue that the Earnest Money Note and Deposit were mere ancillary costs of setting up the "business." In this regard, Defendant relies on *Street-Works Dev. LLC v. Richman*, No. 13 CV 774, 2015 WL 872457, at *4-5 (S.D.N.Y. Feb. 3, 2015) and *US Airways Grp., Inc. v. British Airways Plc*, 989 F. Supp. 482 (S.D.N.Y. 1997). In those cases, the District Courts found that advancing money for business expenses and costs ancillary to the supposed joint ventures did not relate to sharing losses in the joint ventures. The court in *Street-Works* noted, "If 'simply expending efforts to set up a [partnership] were sufficient to

satisfy the essential element of sharing of losses, the requirement could nearly always be satisfied.'" *Id.* quoting *Artco, Inc. v. Kidde, Inc.,* 1993 WL 962596, at *10 (S.D.N.Y. Dec. 28, 1993).

Here, the payment by Colony of the Earnest Money Note and the Earnest Money Deposit was necessary to acquiring the Agreement of Purchase and Sale.  The Agreement of Purchase and Sale was the only actual asset of the joint venture and was essential to its purpose, concluding that same agreement.  Thus, Colony's Earnest Money cannot be characterized as a set up cost or ancillary expense relative to the joint venture.  Rather, the Earnest Money funds were put at risk in order to achieve the specified goal of the joint venture and, but for those funds there could be no joint venture.

Finally, Defendant contends,

> Colony's payment of Earnest Money (Note) and the Earnest
> Money Deposit to Delaney has nothing to do with the contingent
> agreement between Colony and NorthStar *because Colony was
> obligated to pay that sum to Delaney before Colony and NorthStar
> ever interacted.*  (Defendant's Memo, p. 16.) (Emphasis supplied.)

However, the fact that Colony paid its Earnest Money Note and Deposit before entering into the joint venture with NorthStar is immaterial.  In entering into a joint venture with NorthStar, Colony agreed to work exclusively with NorthStar in closing the transaction.  (See the Exclusivity clause of the Term Sheet, Defendant's Exhibit 3.)  In so doing, Colony closed itself off from seeking other financing partners, and thus, Colony fully attached its risk of losing its Earnest Money Note and Deposit to the success or failure of the Colony-NorthStar joint venture.

Similarly, in *Richbell*, the parties sought to acquire a third-party company and merge it with a company already owned by Richbell, which Richbell was contributing to the joint

14

venture.  Richbell's co-venturer agreed to contribute the capital necessary for the third-party

company acquisition.  The fact that Richbell previously owned the merger entity was of no

significance to the Court.  *Richbell*, at 298.  Furthermore, the First Department in *Richbell* held

that equal sharing of losses and profits is not required, stating,

> Similarly, the agreement to share profits and losses was
> sufficiently alleged, since we reject defendants' contention that a
> joint venture requires an *equal* sharing.
>
> To require complete equality among members of a joint venture
> with respect to each of its required elements would be taking a
> significant legal step backward by depriving this business form of
> its raison d'étre, i.e., flexibility as partnership for a limited
> purpose (*see Gramercy Equities Corp. v Dumont,* 72 NY2d 560, 565
> [1988]).

Accordingly, the Complaint sufficiently alleges a sharing of losses by Colony.

### d.  <u>The Complaint Sufficiently Alleges Evidence of the Parties' Intent to be Associated as Joint Venturers</u>

Defendant argues that the Complaint fails to allege that the parties intended to be

associated as joint venturers because,

> [T]he parties were only prepared to be associated as joint
> venturers *if, as, and when the transaction closed* according to the
> terms of the Term Sheet.  Since the transaction never closed, this
> element for a joint venture is not satisfied."  (See Defendant's
> Memo, p. 15.)

Once again, Defendant mischaracterizes the purpose of the joint venture as being to

operate the Delaney Portfolio *after* an acquisition. Whereas, as described above, the stated

purpose of the joint venture was to acquire the property – not to manage, operate or dispose

of it.

The intent to be associated as joint venturers can be implied from the parties' conduct.  In *Richbell* the Court held,

> As noted in *Mendelson v Feinman* (143 AD2d 76 [1988]), the intent of the parties, as one of the factors in determining whether a joint venture exists, may be express *or implied.* Giving plaintiffs the benefit of every favorable inference, such intent may be implied from the totality of the conduct alleged here. *Id.*

Here, the clearest evidence of the parties' intent to be associated as joint venturers for the purpose of closing the agreement is the language in the Term Sheet, wherein the parties agreed to be identified as a joint venture for that purpose alone.  Thus, the Term Sheet provides,

> *After closing*, Colony and NorthStar shall prepare and release a press release ***describing the closing of the transaction as a 'joint venture' of Colony and NorthStar*** in form and substance approved by NorthStar.  *See* Defendant's Exhibit 3, p. at 3 (emphasis supplied).

NorthStar's intent to be associated as a joint venturer with Colony is further implied from NorthStar's request to Colony to execute a release to end the joint venture.  The Complaint alleges NorthStar sought to jettison Colony from the deal shortly after the execution of the Term Sheet, the formation of the joint venture, and the receipt by NorthStar of Colony's trade secret due diligence materials and introductions to Colony's contacts with Delaney.  NorthStar's proposed release would have enabled NorthStar to pursue the acquisition of the Delaney Portfolio independent of Colony without liability or obligation to Colony.  Thus, the Complaint alleges,

> 39.  On the evening of December 24, 2012, NorthStar communicated to Colony its intent to terminate the joint venture, as set forth in the December 21, 2012 Summary of Principal Terms, and requested that Colony release NorthStar from the

agreement.

> 40.  The release NorthStar sought from Colony would allow NorthStar to close a purchase with Delaney for the Delaney Portfolio independent of Colony free from all liability and obligations to Colony under the Summary of Principal Terms.

NorthStar's request for the release demonstrates that NorthStar had previously intended to be associated as a joint venturer with Colony.

Furthermore, NorthStar's proposed release would require NorthStar to pay to Colony an "acquisition fee" of $750,000 if NorthStar acquired the Delaney Portfolio.  The fact that NorthStar was willing to pay $750,000 to be released from liability to Colony manifests that NorthStar believed it had liability as a joint venturer.  (A copy of the proposed release, which is referenced in the Complaint is annexed as Exhibit 1 to the Declaration of Moshe Mortner, submitted herewith.)

Additionally, the specific language of the release proposed by NorthStar would release NorthStar from all liability and obligation to Colony not only under the Term Sheet but also "in respect of any other transaction with respect to the Property," demonstrating that the complete agreement of the parties was understood to entail duties beyond just the Term Sheet (See *Richbell, supra*).

Based on the foregoing, the Complaint has sufficiently pled the intent of the parties to be associated as joint venturers.


    **e.**  **The Ultimate Inquiry:  NorthStar Induced Colony to Trust that NorthStar Would Act for the Parties' Joint Benefit**

Apart from the multi-prong test for finding a joint venture, discussed above, the courts

have often relied on the following "ultimate inquiry," as stated in *Learning Annex Holdings v. Whitney Educ. Group*, 765 F. Supp. 2d 403 (S.D.N.Y. 2011):

> The ultimate inquiry in determining whether a joint venture exists is whether "the parties have so joined their property, interest, skills and risks that for the purposes of the particular adventure their respective contributions have become as one and ... made subject to each of the associates **on the trust and inducement that each would act for their joint benefit**." *Solutia Inc. v. FMC Corp.*, 456 F.Supp.2d 429, 445 (S.D.N.Y.2006) (quoting *Independent Energy Corp. v. Trigen Energy Corp.*, 944 F.Supp. 1184, 1201 (S.D.N.Y.1996)). (Emphasis supplied.)

Here, Colony was induced to trust that NorthStar would act for the parties' joint benefit, because the Term Sheet created by NorthStar described the relationship of the parties as one requiring trust, exclusivity and good faith. Moreover, the Term Sheet expressly described the relationship of Colony and NorthStar as a joint venture, so Colony had every reason to believe that NorthStar would act for the parties' joint benefit.

As a result of NorthStar's inducement, Colony reposed in NorthStar trust that NorthStar would act for Colony and NorthStar's joint benefit. Based on that trust, Colony delivered its trade secret due diligence materials to NorthStar. (See Complaint, ¶ 33.) Indeed, the Term Sheet provided, "Colony will deliver to NorthStar all of Colony's diligence materials obtained in connection with its potential purchase of the Property and request that NorthStar be able to rely on all third party reports Colony obtained."

The Delaney Portfolio was a large and complex transaction, involving a purchase price of over $90 million and the acquisition of five separate multi-family properties. As a result, Colony's due diligence materials were voluminous and had been assembled over a period of months at a cost of $268,379. (See the Term Sheet, Defendant's Exhibit 3, p.6.) Without

Colony's due diligence materials, NorthStar, a publicly traded company, could not responsibly and prudently formulate an offer to acquire the Delaney Portfolio.  However, Colony provided to NorthStar those materials, thereby enabling NorthStar to take the deal on its own.  In providing the due diligence materials to NorthStar, Colony evidenced its trust that NorthStar would only use those materials for the parties' joint benefit.

As a further sign of Colony's trust in NorthStar's intention to work for their joint benefit, Colony introduced representatives of NorthStar to Delaney's representatives so NorthStar could directly negotiate terms of the transaction.   (See Complaint, ¶ 35.)  In doing so, Colony reposed trust in NorthStar that it would use direct access to the seller only for their joint benefit, and not for the purpose of circumventing Colony and pursuing its own deal with Delaney.

Finally, believing that NorthStar would act for their joint benefit, Colony committed to an exclusive relationship with NorthStar for the particular purpose of the venture, to close the Delaney Portfolio transaction.  Thus, Colony evidenced it trust in NorthStar's loyalty to the joint venture by closing itself off from all other potential providers of capital at the very moment that Colony's time to close the transaction was running down.  The Exclusivity paragraph of the Term Sheet, which Colony accepted, provides,

> Colony (on its own behalf and on behalf of its affiliates) agrees to negotiate and work in good faith with NorthStar in order to facilitate closing. Colony  (on its own behalf  and on behalf of its affiliates) agrees to cease and not initiate or entertain any and all discussions, negotiations, due diligence or other efforts with all other parties  concerning any type of financing, transfer, partnership structure, equity structure or transaction which may be an alternative to the transactions contemplated  herein. (See the Term Sheet, Defendant's Exhibit 3, p. 3.)

In agreeing to the Exclusivity paragraph of the Term Sheet, Colony reposed its trust in NorthStar, believing that NorthStar would act in good faith to close Colony's Agreement of Purchase and Sale with Delaney. Colony placed at risk its Earnest Money Note and its Earnest Money Deposit, together worth $1.75 million, based on the trust that NorthStar would act for their mutual benefit.

Based on the foregoing, the Complaint pleads that the joint venture was formed on the trust and inducement that each party would act for their joint benefit, and that is the ultimate test of a joint venture.

## IV. THE COMPLAINT ALLEGES THAT NORTHSTAR'S BREACH OF ITS DUTY OF LOYALTY DIRECTLY CAUSED DAMAGES TO COLONY

The elements of a breach of fiduciary duty claim are: "(i) the existence of a fiduciary duty; (ii) a knowing breach of that duty; and (iii) *damages resulting therefrom*." *Johnson v. Nextel Commc'ns, Inc.,* 660 F.3d 131, 138 (2d Cir. 2011). (Emphasis supplied.)

Defendant argues that "the Complaint is devoid of any allegation that NorthStar's alleged breach of fiduciary duty directly caused any injury to Colony." (See Defendant's Memo, p. 19.) Defendant's statement is demonstrably false, as the following paragraphs from the Complaint make apparent:

> 51. Subsequently, on May 20, 2013, Colony consummated a deal to acquire the Delaney Portfolio with a loan supplied by Key Bank, instead of Citigroup.
>
> 52. However, the terms of the transaction between Colony and Delaney were far more onerous on the purchaser than the transaction originally contemplated between Colony and Delaney, in part because Hanson did not receive the $10,000,000 loan of seller financing originally committed by the seller. In addition, the

cost of the financing for the deal was greater.

53.  The reason that Colony was forced to accept less profitable terms was because Delaney required terms like the terms offered by NorthStar on December 30, 2012, when NorthStar tried to take the deal for itself with an offer of no seller financing, in the midst of Colony and NorthStar's joint venture, and again when NorthStar reproposed its offer to Delaney on January 23, 2013.

*\*\**

62.  During the period that the joint venture was in effect, NorthStar breached its duties of loyalty and good faith by proposing a deal for the acquisition of the properties to Delaney, which was independent of the joint venture and at Colony's expense, and that undercut Colony's previously negotiated contract with Delaney which was still in force.

*\*\**

66. Plaintiff Colony Hills Capital, LLC has been damaged by defendant NorthStar's breaches of its fiduciary duties.

The foregoing allegations establish that Plaintiff's injury arose from NorthStar's misconduct.  Yet, Defendant does not address these allegations in its argument, rather, Defendant contends, "The Complaint states, only in the most general and conclusory terms, that Colony was harmed, but does not specify how." (See Defendant's Memo, p. 20.) Defendant's argument simply ignores the pleadings.

Defendant further argues,

Finally, to the extent the Complaint alleges injury in connection with its purchase of the Delaney Portfolio, it does not allege that Colony paid more for the portfolio than the $98 million it had agreed to pay under the original PSA... (Def. Memo, p. 20.)

Defendant is wrong.  In a large and complex transaction, such as the purchase of the Delaney Portfolio, price is only one aspect of the deal's real cost.  The Complaint alleges an injury directly resulting from NorthStar's misconduct: "[T]he terms of the transaction between

21

Colony and Delaney were far more onerous on the purchaser than the transaction originally contemplated between Colony and Delaney;" (Compl. ¶ 52) and "Colony was forced to accept less profitable terms." (Compl. ¶ 53.)  Defendant's argument simply ignores the allegations in the pleading.

Had Colony never been able to close a deal with Delaney, but brought this action nevertheless, NorthStar would be heard to argue that the damages are speculative because Colony could not possibly have concluded a transaction without NorthStar.  However, here Colony did conclude a transaction.  The damages alleged are the higher cost of the transaction and the loss of substantial profit, which resulted directly from NorthStar's competing offer to Delaney that was made in breach of NorthStar's fiduciary duty to Colony.  Thus, Defendant's argument that damages have not been properly pled is totally without merit.

### V. PLAINTIFFS PROPERLY STATED CLAIMS FOR TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS ADVANTAGE

#### a. Plaintiffs Have Properly Pled that NorthStar Engaged in Wrongful Conduct

Tortious interference with prospective contractual relations or prospective business advantage, like its name, entails a cause of action in which the alleged interference occurs where there is no contract.  In *Posner v Lewis*, 18 N.Y.3d 566, 570, fn.2, 965 N.E.2d 949, 952, 942 N.Y.S.2d 447, 450 (2012), the Court of Appeals held, "To state a cause of action for tortious interference with prospective contractual relations, a plaintiff must plead that the defendant directly interfered with a third party and that the defendant either employed wrongful means or acted for the sole purpose of inflicting intentional harm on plaintiff".  (See also *Caprer v Nussbaum,* 36 AD3d 176, 204 [2006]; *Carvel Corp. v Noonan*, 3 NY3d 182, 190 [2004]; *NBT*

*Bancorp v Fleet/Norstar Fin. Group*, 87 NY2d 614, 624 [1996]; *Manti's Transp., Inc. v C.T. Lines*,

*Inc.*, 68 AD3d 937, 940 [2009]). "As a general rule, such wrongful conduct must amount to a

crime or an independent tort, and may consist of 'physical violence, fraud or misrepresentation,

civil suits and criminal prosecutions'"(*Smith v Meridian Tech., Inc.,* 86 AD3d 557, 560

[2011], quoting *Guard-Life Corp. v Parker Hardware Mfg. Corp.,* 50 NY2d 183, 191

[1980]; *see NBT Bancorp v Fleet/Norstar Fin. Group,* 87 NY2d at 624; *Manti's Transp., Inc. v C.T.*

*Lines, Inc.,* 68 AD3d at 940).

Here, Counts II and III of the First Amended Complaint allege tortious interference with

prospective business advantage arising from Defendant's wrongful conduct that amounted to

an independent tort.  Specifically, Plaintiffs allege that NorthStar's wrongful conduct was the

misappropriation of trade secrets.  Thus, the Complaint states,

> 72.  Northstar's wrongfully interfered in Colony's prospective
> business advantage by wrongful use of proprietary due diligence
> materials and trade secrets pertaining to the prospective
> acquisition of the Delaney Portfolio, which Northstar obtained
> from Colony and its agents, including Greystar, while Northstar
> was a fiduciary of Colony.
>
> 73.  As a fiduciary of Colony, Northstar obtained due diligence
> materials and trade secrets pertaining to the prospective
> acquisition of the Delaney Portfolio solely for the purpose of
> facilitating an acquisition of the Delaney Portfolio by Northstar
> and Colony together as joint venture partners. (Compl. ¶¶ 72-73a)

In *Guard-Life v. Parker Mfg*, 50 NY 2d 183 (1980), the New York Court of Appeals dealt

with at will contracts of employment, which "are classified as only prospective contractual

relations…" *Id*.  The Court recognized in actions for wrongful interference in at will contracts of

employment, torts akin to the misappropriation of a trade secret do in fact constitute the type

of wrongful acts that would give rise to a claim for tortious interference.  Thus, the Court of

Appeals held,

> Where contracts terminable at will have been involved, we have
> upheld complaints and recoveries in actions seeking damages for
> interference when the alleged means employed by the one
> interfering were wrongful, as consisting of fraudulent
> representations (*Rice v Manley*, 66 N.Y. 82), or threats (*Lurie v
> New Amsterdam Cas. Co.*, 270 N.Y. 379) or as in violation of a duty
> of fidelity owed to the plaintiff by the defendant by reason of a
> relation of confidence existing between them (*A.S.Rampell, Inc. v
> Hyster Co.*, 3 N.Y.2d 369; *Duane Jones Co v Burke*, 306 N.Y. 172).

Based on the foregoing, Plaintiffs' claims of tortious interference with prospective

contractual relations arising from NorthStar's wrongful misappropriation of trade secrets and

use of those materials to interfere with Colony's efforts to secure a deal with Delaney for the

Delaney Portfolio is in full accord with New York's formulation of tortious interference in the

absence of a contract or in the case of a contract at will.

Defendant argues that the Plaintiffs have failed to state a cause of action for tortious

interference because Plaintiffs failed to allege an independent tort.  Defendant states,

> Plaintiffs allege that NorthStar interfered with Colony's business
> relationship with Delaney through "wrongful use" of due diligence
> that NorthStar obtained pursuant to the Term Sheet. Compl. ¶¶
> 72-73. Plaintiffs do not, however, identify a tort that NorthStar
> committed when it allegedly obtained and used this material. Def.
> Mem., p.23.

Contrary to Defendant's argument, Plaintiffs have properly alleged the independent tort

of the misappropriation of trade secrets.  The Second Circuit has observed that New York

follows *Restatement of Torts* § 757 for its definition of a trade secret. *FMC Corp. v. Taiwan

Tainan Giant Industrial Co.,* 730 F.2d 61, 63 (2d Cir.1984) (per curiam). That definition, in

pertinent part, provides:

> A trade secret may consist of any formula, pattern, device or

> compilation of information which is used in one's business, and
> which gives him an opportunity to obtain an advantage over
> competitors who do not know or use it. (*Restatement of Torts* §
> 757, comment b.)

Here, the Complaint alleges the competitive advantage obtained by the use of Colony's

due diligence materials, wherein it states,

> 74.  But for the wrongful means employed by Northstar to
> interfere in Colony's prospective business relations with Delaney,
> Northstar would not have been able to compete with Colony by
> submitting competitive offers for the Delaney Portfolio, because
> Northstar could not have obtained the due diligence materials
> necessary to make a competing offer through its own research
> during the brief period of competition between the Colony and
> Northstar in the month of January 2013.

Based on the foregoing, Colony properly alleged that its due diligence materials were, in

fact, trade secrets.

The Complaint also alleges that the trade secret due diligence materials were wrongfully

misappropriated by NorthStar.  In *Integrated Cash Mgmt. Serv. v. Digital Transactions*, 920 F. 2d

171 (2d Cir. 1990), the Court identified the elements of the tort,

> A plaintiff claiming misappropriation of a trade secret must prove:
> "(1) it possessed a trade secret, and (2) defendant is using that
> trade secret in breach of an agreement, confidence, or duty, or as
> a result of discovery by improper means." *Rapco Foam, Inc. v.
> Scientific Applications, Inc.,* 479 F.Supp. 1027, 1029
> (S.D.N.Y.1979); *see Hurst v. Hughes Tool Co.,* 634 F.2d 895, 896
> (5th Cir.), *cert. denied,* 454 U.S. 829, 102 S.Ct. 123, 70 L.Ed.2d 105
> (1981); *Restatement of Torts* § 757 (1939).

As noted above, Colony's due diligence materials for the Delaney Portfolio acquisition

were a protectable trade secret, conferring competitive advantage in the effort to acquire the

Delaney Portfolio.  Furthermore, NorthStar's use of those materials was wrongful because it

occurred in breach of the duty of loyalty that NorthStar accepted upon itself by entering into a

joint venture with Colony.

It is immaterial that the joint venture between Colony and NorthStar was no longer extant at the time that NorthStar wrongfully used Colony's trade secrets, because NorthStar received those materials from Colony only by reason of a relation of confidence existing between them (*Integrated Cash Mgmt. Serv., supra*) at the time Colony provided those trade secrets to Northstar.  NorthStar's use of Colony's due diligence materials for its own benefit constituted a breach of the confidence Colony rightfully entrusted in NorthStar and was a violation of the duty of loyalty NorthStar had accepted by requesting and receiving the due diligence materials for the parties mutual benefit.

Based on the foregoing, Plaintiffs have properly pleaded NorthStar's misappropriation of trade secrets as the independent tort constituting NorthStar's wrongful conduct in connection with the Complaint's causes of action for tortious interference with prospective business advantage.

### b. NorthStar Caused a Termination of Colony's Business Relationship with Delaney, Albeit a Different Relationship was Subsequently Created.

NorthStar argues that the tortious interference claims must fail because NorthStar's conduct did not cause a termination of Colony's relations with the seller, Delaney.

To establish a claim of tortious interference with prospective economic advantage, a plaintiff must demonstrate (i) that the defendant's interference with its prospective business relations was accomplished by wrongful means or (ii) that defendant acted for the sole purpose of harming the plaintiff (*Snyder v Sony Music Entertainment,* 252 AD2d 294, 299-300 [1999]; *see Carvel Corp. v Noonan,* 3 NY3d 182, 190-191 [2004]; *Jim Ball Chrysler LLC v Marong Chrysler-Plymouth, Inc.,* 19 AD3d 1094, 1095 [2005]; *South Fourth St. Props. v Muschel,* 1 AD3d 347, 348

[2003].) Defendant now adds a new element to this longstanding doctrine, to wit, the interference must result in a breach in the heretofore not yet formed, inchoate and prospective relationship between the plaintiff and a third party.

To support its novel argument Northstar relies on *Herrick Co. v. Vetta Sports, Inc.*, No. 94 Civ. 0905, 1996 WL 434571, at *4 (S.D.N.Y. Aug. 2, 2006) and *Khan v. Salomon Bros. Inc.*, 813 F. Supp. 191, 195 (E.D.N.Y. 1993). However, in *Herrick* the Court acknowledges that it was dealing with the *performance* of an existing business relation. Consistent with the rule in such cases, the Court held that absent a breach of the contract, no cause of action will lie with respect to performance alone. *Khan v. Salomon Bros. Inc.* is distinguishable from the instant action because the Court in that action noted, "Kahn does not allege that any particular business relationship between Discount and its customers was prevented or discontinued."

Most important, there is no support for Defendant's theory of law in New York. In fact, in *Snyder v. Sony Music*, 252 AD 2d 294, 300 (1st Dept. 1999) Defendant's theory is refuted. The Court in *Snyder* considered a case in which the plaintiff sued for tortious interference with prospective economic advantage because the defendants' wrongful conduct of slander ***jeopardized*** the plaintiff's relationship with his at-will employer, and consequently the plaintiff voluntarily resigned from his employment even before a decision to fire him was made by his employer. The First Department had no issue with the fact that the cause of action was based only on the claim that the plaintiff's employment "was placed in jeopardy by" the defendant's conduct. Rather, the Court held, *inter alia,* that the claim of tortious interference with prospective economic advantage should be dismissed because the defendant's conduct was not the sole proximate cause for the plaintiff's employment being in jeopardy.

Thus, *Snyder* demonstrates that New York has not taken on the novel element to this tort – destruction of the relationship -- that Defendant now proposes.

Moreover, even if Defendant was correct on the law, the Complaint would still properly state causes of action for interference with prospective economic advantage because, in fact, a particular business relationship between Colony and Delaney was discontinued and prevented from being revived as a result of NorthStar's conduct.

Defendant incorrectly describes the Complaint, saying, "Colony does not argue that it was unable to consummate the purchase of the Delaney Portfolio ***pursuant to the PSA***, only that it purchased the Portfolio under less favorable terms as a result of NorthStar's alleged interference." (Def. Memo, p.25.) (Emphasis supplied.) In fact, Defendant has misstated the Complaint.  The Complaint absolutely contends that, pursuant to the PSA, Colony was unable to consummate the purchase of the Delaney Portfolio.  The Complaint alleges that because of NorthStar's wrongful conduct, the PSA or "Agreement to Purchase and Sell" was lost and the transaction proposed therein could not be revived or extended.  The unique feature of that transaction was that it contained $10,000,000 in seller financing.  Those terms, along with the PSA transaction, was lost to Colony as a result of NorthStar wrongful conduct, as the Complaint states,

> 20.  Also on October 16, 2012, Delaney agreed that one or more of their members would lend $10,000,000 to Plaintiff Glenn Hanson simultaneously with the closing of the acquisition by Colony of the Delaney Portfolio. Hanson would then invest the loan proceeds in a special purpose entity, Colony Hills Residential III, LLC, which in turn would invest the funds in the acquisition of the Delaney Portfolio.

> \*\*\*

45.  On December 30, 2012, Northstar, acting on its own, communicated an offer to Delaney for Northstar to acquire the properties independent of Colony for $96,000,000, with no seller financing, such as the $10,000,000 loan to Hanson which was part of the proposed deal between Colony and Delaney.

\*\*\*

75.  Northstar's wrongful acts had the effect of (i) causing Delaney to offer a less advantageous transaction to Colony…

\*\*\*

79.  As a result of Northstar's acts in connection with Delaney and the Delaney Portfolio, in breach of its fiduciary duties owed to Colony, described above, Delaney withdrew its offer to lend $10,000,000 to Hanson for Hanson to invest in the acquisition of the Delaney Portfolio.

Albeit, in May 2013, Colony eventually consummated a new deal with Delaney to acquire the Delaney Portfolio, but that transaction in 2013 was based on an altogether different contract and a new business relationship, and did not include seller financing, which was a key feature of the relationship between Colony and Delaney in 2012.  Plaintiff alleges that but for NorthStar's wrongful interference, Plaintiff could have consummated the transaction described in the PSA.  However, because of NorthStar's wrongful conduct, Delaney refused to reinstate and continue Colony and Delaney's original business relationship.  Colony was forced to forge a new relationship and transaction with Delaney, which it eventually did in 2013 even though NorthStar was also pursuing its own deal with Delaney at that time. (Compl., ¶53)  The fact of Colony and Delaney's *rapprochement* does not belie the fact that the prospective business relationship as it had existed between Colony and Delaney under the PSA was wrecked by NorthStar's wrongful interference.

Based on the foregoing, the Plaintiffs have properly made out claims for tortious

interference with prospective business advantage.

VI.   **COLONY HAS STATED A CLAIM FOR UNJUST ENRICHMENT**

In Colony's final cause of action against NorthStar (Count IV of the First Amended

Complaint), Colony alleges that NorthStar was unjustly enriched by the payment of $75,000

in fees for NorthStar to work as a mezzanine lender to secure a deal for Colony with Delaney.

(Compl., ¶ 83).  NorthStar, in its motion to dismiss contends, "Colony has not alleged how

NorthStar's retention of the funds was unjust."  (Def. Memo, p. 27.)  In fact, the unjustness of

NorthStar's retention of the fees paid by Colony is apparent.  Colony introduced Northstar to

the Delaney transaction for NorthStar to work as a lender for the success of Colony, but

NorthStar soon after sought to retrade the transaction for its own benefit, as the Complaint

states,

> 26.  On December 19, 2012, the revised closing date, Northstar
> shocked Colony by stating supplant Colony as the purchase it was
> no longer willing to act as merely lender in the Delaney Portfolio
> transaction.  Instead, Northstar demanded a new arrangement, in
> which Northstar would become the purchaser of the Delaney
> portfolio and would pay 100% of the purchase price to Delaney in
> an all cash deal.  In the new deal demanded by Northstar, Colony
> would be relegated to earning an acquisition fee of 0.5% and 5%
> of equity.
>
> 27.  If Colony rejected Northstar's retrade demand, Colony would
> be left without a mezzanine lender for the Delaney Portfolio
> acquisition and would be in default to Delaney, resulting in the
> forfeiture of Colony's deposit of $500,000 in Earnest Money and
> resulting in a call on Colony's $1,250,000 Earnest Note.  Colony
> would also lose its investment in due diligence costs.

Thus, it was unjust for NorthStar to seek to take the deal away from Colony, and then

retain the fees which it was paid by Colony to make the deal for Colony.

NorthStar further argues that, notwithstanding any liability that may exist from the payment of $75,000, Colony released NorthStar from such liability through the release language contained in the Term Sheet, dated December 21, 2012.  However, Plaintiff contends that the release in the Term Sheet was voided by NorthStar's repudiation of its obligations to Colony and its breach of the joint venture agreement.  As the Complaint states,

> 42.  On December 25, 2012, NorthStar advised Colony that it was unilaterally terminating the joint venture agreement memorialized in the December 21, 2012 Summary of Principal Terms.

Accordingly, Colony contends NorthStar cannot rely on the release, while it repudiated and breached the agreement of which the release was a part.  A general release is governed by principles of contract law.  *Mangini v. McClurg*, 24 NY 2d 556, 562 (1969), and here, NorthStar's repudiation of the agreement relieved Colony from abiding by the release.  The law of repudiation was stated by the Second Circuit in *Aetna Cas. And Sur. v. Aniero Concrete*, 404 F. 3d 566, 587 (2d Cir. 2005), wherein the Court stated,

> Under the doctrine of anticipatory breach, "**a wrongful repudiation of the contract by one party** before the time of performance entitles the non-repudiating party to immediately claim damages for total breach," and **will relieve the non-repudiating party of its obligations of future performance**. *American List Corp. v. U.S. News & World Report, Inc.*, 75 N.Y.2d 38, 550 N.Y.S.2d 590, 593-94, 549 N.E.2d 1161 (Ct.App.1989) (citations omitted). **Repudiation occurs when a party manifests an intent not to perform, either by words or by deeds**, See *200 East 87th Street Assocs. v. MTS, Inc*., 793 F.Supp. 1237, 1253 (S.D.N.Y.), aff'd mem., 978 F.2d 706 (2d Cir.1992); *Key Bank of New York, N.A. v. K.H. Assocs*.,210 A.D.2d 769, 620 N.Y.S.2d 537, 537 (3rd Dep't 1994); see also Restatement (Second) of Contracts § 250 (1981)(obligor repudiates contract when it states its intent to totally breach, or when it commits an affirmative act which renders it unable to perform absent such a breach), or when one party "insist[s] upon terms that are not

31

contained in a contract," *Towers Charter & Marine Corp. v. Cadillac Ins. Co.*, 894 F.2d 516, 523 (2d Cir.1990)(quoting *REA Express, Inc. v. Interway Corp.*, 538 F.2d 953, 955 (2d Cir.1976)). (Emphasis supplied.)

Finally, Northstar contends that Colony's claim for recoupment of the payment of $75,000 in fees to NorthStar should have been brought as a contract action, rather than as an equitable claim.  (Def. Memo, p. 26)  Plaintiff believes this action can be stated based on equity, however, in the event that the Court agrees with Defendant, Colony respectfully requests leave to replead Count IV as a cause of action at law.

Based on the foregoing, under principles of equity, NorthStar has been unjustly enriched by the retention of the $75,000 paid to it by Colony.


## CONCLUSION

For the foregoing reasons, the Court should deny Defendant NorthStar's motion to dismiss Plaintiffs' First Amended Complaint, or in the alternative the Court should grant leave to Plaintiffs to amend the pleading to correct any causes of action this Court finds have not been sufficiently pleaded.

Dated: New York, NY
      September 24, 2015

THE MORTNER LAW OFFICE

By: _____
    Moshe Mortner, Esq. (MM-0019)
40 Wall Street, 28th Floor
New York, NY  10005
Tel.:  877-365-2177

LAW OFFICES OF PAUL M. MONZIONE, PC

By: _____/s/_____

    Paul M. Monzione, Esq.

2 South Main Street, 2d Floor

PO Box 1478

Wolfeboro, NH 3894

Tel.: (603) 569-9599

*Counsel for Plaintiffs Colony Hills Capital, LLC and Glenn Hanson*